SANFORD R. RAZEE V. STATE OF NEBRASKA.

FILED MAY 3, 1905. No. 13,934.

1. **Newspaper of General Circulation.** A newspaper to be of general circulation, within the meaning of section 47 of the criminal code, must circulate generally beyond the county where it is published. It is not necessary that it circulate in every county of the state, but its circulation must extend and be general beyond the county where it is published.

2. **Libel: DEFENSE.** In a criminal prosecution under the provisions of section 47 of the criminal code, for publishing an alleged libelous article, the truth of the article, when established, is a perfect defense.

3. **Information: AMENDMENT.** The court may, in its discretion, before trial, permit the county attorney to amend a criminal information, provided the amendment does not change the nature or identity of the offense charged, and the information as amended charges no other crime than the one on which the accused has had a preliminary examination.

4. **Witness: CROSS-EXAMINATION.** By statute the accused is made a competent witness in his own defense; and when he avails himself of that privilege he may be cross-examined the same as an ordinary witness as to matters brought out on his direct examination. But neither the prosecuting attorney, nor private counsel assisting him, should be permitted to cross-examine the accused as to matters not brought out or provoked by his direct examination, which are wholly incompetent and immaterial, and which plainly tend to disgrace him before the jury.

ERROR to the district court for Frontier county: ROBERT C. ORR, JUDGE. *Reversed.*

*J. L. McPheely* and *Starr & Reeder,* for plaintiff in error.

*Norris Brown, Attorney General, William T. Thompson* and *J. L. White, contra.*

BARNES, J.

The plaintiff in error was convicted of criminal libel at the September, 1903, term of the district court for Fron-

tier county, and sentenced to a term of one year in the state penitentiary. From that judgment he prosecutes error.

It appears that he was the proprietor and publisher of a newspaper published at the village of Curtis in said county, called "The Curtis Courier," and on the 26th day of June, 1903, published in his said paper the article which was the basis of the prosecution. It contained an affidavit made by one Philip C. Geines, in which he stated, in substance, that he never signed the petition of the prosecuting witness to obtain a druggists' permit from the board of the village of Curtis to sell malt, spirituous and vinous liquors, and never authorized any one to sign it for him; together with the comments of the accused thereon. The information set forth the publication in full, and alleged that the newspaper in question was one of general circulation. The accused entered a plea of not guilty, and on the trial introduced evidence tending to show the truth of the affidavit, and all of the matters contained in the article complained of. He also testified in his own behalf that the article was published without malice, with a good motive and for justifiable ends, to wit, the suppression of the unlawful sale of intoxicating liquors; and this was one of his defenses.

As above stated, it was charged in the information that the newspaper in question was one of general circulation. The state attempted to prove, and the jury affirmatively found, such to be the fact. The evidence to support such finding is found in the testimony of the witness Herbert S. Moorer, who, it appears, was the foreman of the "Courier" at the time the article was published, and who testified, in substance, as follows: That approximately the circulation of the paper was between two hundred and ninety and three hundred; that as near as he could remember the entire issue, which contained the article in question, was mailed to Stockville, Maywood, Moorefield and Eustis, perhaps some to Elwood, and one or two of the smaller post offices in the county, to which they were carried by star

route. When asked, "What, if any, circulation did it have outside of Frontier county?" he answered, "Perhaps a third of the entire circulation. I would not be positive as to that." The witness further stated that the papers mailed to points outside of the state were merely exchanges. The only place designated by the witness to which papers were sent outside of Frontier county was the village of Elwood, a station on the Burlington railroad in Gosper county, to which place it was stated that "perhaps a few copies were sent." With the evidence in this condition the court charged the jury as follows: "You are instructed that to be a newspaper of general circulation, such newspaper must circulate beyond the county where it is published. To have a general circulation it is not necessary that it circulate in every county of the state, but it must extend beyond the county in which it is published to have a general circulation." The giving of this instruction is assigned as error. By section 47 of the criminal code, it is provided: "If any person shall write, print, or publish any false and malicious libel of, or concerning another, or shall cause or procure any such libel to be written or published, every person so offending shall, upon conviction thereof, be fined in any sum not exceeding five hundred ($500) dollars, or be imprisoned in the county jail not exceeding six (6) months, or both, at the discretion of the court. * * * *Provided,* That if said libel is published in a newspaper having a general circulation, the person so offending shall be punished by imprisonment in the penitentiary not less than one (1) nor more than three (3) years." So one of the most vital questions in the whole case was whether the "Courier" was a newspaper having a general circulation. The provision above quoted was construed in *Koen v. State,* 35 Neb. 676, 17 L. R. A. 821, where, after much discussion of the meaning of the word "general" and the expression "general circulation," it was held that to charge a felony the paper must be of general circulation, and that the limitation to one county merely charged a misdemeanor. It was further said:

"It is not necessary that the newspaper circulate to any considerable extent, if at all, out of the state, nor that it circulate in every county in the state, but it must extend beyond the county in which it is published and have a general circulation."

We find no other case in which the statute in question has been construed or its meaning defined, and we are constrained to follow the rule above quoted. If the circulation of a newspaper, when confined to the county in which it is published, is limited special or local only, in order to make the paper one of general circulation it must circulate generally outside of and beyond such county. It would not seem to be sufficient to prove that some copies of the paper were sent to a single town or post office outside of the county where it is published, as was attempted to be shown by the evidence in the case at bar. By the instruction complained of the jury were told that it was not necessary for a newspaper to circulate in every county in the state, but it must extend beyond the county in which it is published to have a general circulation. With this instruction applied to the evidence on that question it is quite apparent that the jury might readily find that the newspaper in question was one of general circulation; when, if the instruction had followed the rule announced in *Koen v. State, supra,* and the jury had been plainly told that the circulation of the paper must extend and be general beyond the county where it is published, an entirely different finding on that question might have resulted. Whether the "Courier" was a newspaper of general circulation was one of fact for the determination of the jury under proper instructions. And it was the duty of the court to clearly define the meaning of the words "general circulation" so that by a consideration of the evidence the jury could correctly determine that issue. So we conclude that the instruction complained of was prejudicial to the rights of the accused.

The accused having introduced evidence tending to show the truth of the article complained of, and that it was

published with good motives and for justifiable ends, requested the court to instruct the jury, in substance, that the truth of the statements contained in the article would be a good defense. This instruction was refused, and the court instructed the jury, at the request of the prosecution, as follows: "If you find that the defendant wrote, printed and published in the Curtis Courier the article alleged to be a libel, and he has shown such article to be true, this will not exempt him from liability, if you find from the evidence beyond a reasonable doubt that he acted without good motives and without justifiable ends." This instruction was excepted to, and the refusal to charge as requested, and the giving of the instruction quoted, is assigned as error. The question thus presented was considered by this court in *Larsen v. Cox*, 68 Neb. 44, which, however, was a civil action for damages instead of a criminal prosecution. Judge SULLIVAN, who wrote the opinion, said:

"The contention of counsel for plaintiff is that the truth is unavailing unless it was uttered with a good motive and for a proper purpose. His argument is grounded altogether upon the provision of the constitution which declares that 'in all trials for libel, both civil and criminal, the truth when published with good motives, and for justifiable ends, shall be a sufficient defense.' Constitution, art. I, sec. 5. The provision here quoted is a substitute for section 3, article I of the constitution of 1866, which was an almost literal copy of a New York statute adopted soon after the trial of the celebrated case in which Croswell was convicted of publishing a libel on Thomas Jefferson. *People v. Croswell*, 3 Johns. Cas. (N. Y.) 336. This statute was intended to secure and safeguard the freedom of the press, and is now fundamental law in many of the states. It was a modification of the doctrine of the common law that, in public prosecution for libel, the truth of the libel is no excuse for its publication. When considered in the light of history, there is much reason to suppose that the constitutional provision upon which plaintiff relies was

designed as a sure and permanent protection, both in civil and criminal actions, to persons who have occasion, in the discharge of some legal, social or moral duty, to write and publish criticisms on the character and conduct of others, and that it was not any part of its purpose to take away from the defendant in a libel case any right given him either by the statutory law or the common law. The truth of a defamatory publication is still a complete and perfect defense in a criminal case, irrespective of the motive or object of the publisher."

Indeed, the legislature in defining the crime has made it so. It is difficult to see how any other construction can be given to section 47 of the criminal code. The language of that section defining the crime of libel and providing a punishment therefor plainly requires that the libelous article must be both false and malicious. It follows that when it is shown that the alleged libelous publication is, in fact, true, the principal element of the crime has no existence; hence, the truth of the publication must be a perfect defense to a criminal prosecution. For these reasons, we are of opinion that the court erred in refusing to charge as requested by the accused, and in giving the instruction complained of.

It is also contended that the court erred in allowing the county attorney to amend the information. It is true that the state will not be permitted to amend an indictment, and the reason for that rule is that, the grand jury having been discharged, the body that found the indictment no longer exists; that no other entity can act for such grand jury, and, of course, no amendment to the indictment can be lawfully made. This reason does not apply to an information. The county attorney who made it, being still the prosecuting officer with power to make a new information against the accused, if necessary, can amend the original, provided the amendment does not change the offense charged, and its identity is not destroyed. There can be no substantial objection urged to an amended information which charges the same offense on which the accused has

had his preliminary examination. The amendment allowed in this case embraced matters of clerical errors and punctuation only, so we conclude that the ruling of the court on that question was correct.

Lastly, it is contended that the court erred in permitting the prosecution to cross-examine the accused as to matters not testified to by him on his direct examination, and that such cross-examination was prejudicial to his rights, because it tended to discredit him before the jury. It appears that the accused, who was a man sixty years of age, was a witness in his own behalf, and after stating his age, occupation and place of residence, testified, in substance, that the affidavit which was the basis of the alleged libelous article was furnished him without solicitation by the person who made it; and that he published the article in question without malice, with good motives and for justifiable ends, to wit, for the purpose of aiding in the suppression of the liquor traffic in the village of Curtis. Thereupon, he was cross-examined by private counsel employed to assist the public prosecutor, and was asked a great many questions touching his domestic relations; the number of times he had been married; whether his first wife was living; and many other questions tending to disgrace him in the eyes of the jury. Objections to some of these questions were sustained, but many of them he was required to answer. Among other things the court permitted counsel to ask, and compelled him to answer the question: "Is it not a fact that some three years previous, when you procured your license to marry your present or last wife, you stated that you were only forty-eight years old?" None of these questions were provoked by anything that the accused testified to on his direct examination. None of them had any relation whatever to the crime with which he was charged. He had not put either his character as a law-abiding citizen or his reputation for truth and veracity in issue; he had introduced no evidence whatever as to his character, and it is apparent that the purpose of the cross-examination was to disgrace him before

the jury.   This the court should not have permitted.   It is provided by statute that a defendant in a criminal prosecution may testify in his own behalf.   If he avails himself of that privilege, it is the duty of the court to protect him against a cross-examination which is wholly irrelevant and immaterial, and clearly tends to prejudice him before the jury.   It is true that when one offers himself as a witness in his own defense, he may be cross-examined as to any matter brought out in his direct evidence.   As to such matters he is on the same footing with an ordinary witness, but as to matters outside of such examination, and which would tend to show that he might have been guilty of some offense other than the one for which he is being tried, or as to any matter which would bring him into disgrace before the jury, he is certainly entitled to the protection of the court.   We think the contention of the accused on this point should be sustained, and this, when considered with the other matters complained of, requires us to grant him a new trial.

For the foregoing reasons, the judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED.